# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

HOMER BEN BARGER,                      )
                                   )
        Petitioner,          )
                                   )
v.                                     )          **Case No. CIV 05-090-FHS**
                                   )
RON WARD, Warden,                      )
                                   )
        Respondent.          )

## OPINION AND ORDER

This matter is before the court on Petitioner's petition for a writ of habeas corpus. Respondent has filed a response arguing Petitioner is not entitled to relief. Petitioner is an inmate currently incarcerated at Davis Correctional Facility. He challenges the execution of his sentence pursuant to 28 U.S.C. § 2254. Petitioner was sentenced to life imprisonment for First Degree Murder and seven (7) years imprisonment for Second Degree Burglary with the sentences to be served consecutively.

Petitioner has submitted the following grounds for relief:

There was no evidence presented at trial to support a finding of guilt for First Degree Murder or Second Degree Burglary. The trial court erred in admitting a deposition instead of requiring the State to produce Harlan Smith at trial.

Respondent argues the Oklahoma Court of Criminal Appeal's decision that sufficient evidence was presented to support Petitioner's convictions for Second Degree Burglary and First Degree Murder was not contrary to or an unreasonable application of <u>Jackson v. Virginia</u> and that the Oklahoma Court of Criminal Appeals determination that the deposition of Harlan Smith was properly admitted was not contrary to or an unreasonable application of Supreme Court Law, nor was it based on an unreasonable determination

1

of the facts.

Respondent has submitted the following records to the court for consideration in this matter:

a.   Petitioner's direct appeal brief filed June 24, 2003.

b.   The State's brief in Petitioner's Direct Appeal filed October 22, 2003.

c.   Summary Opinion in <u>Homer Ben Barger v. State of Oklah</u>oma, 2002-955 (Okla. Crim. App. February 27, 2004).

d.   Trial transcript Volume I, Volume II, Trial transcript Volume III, and In Camera Hearing Transcript, February 4-7, 2002.

## Facts

In the early morning hours of February 29, 2000, Richard Harkey ("decedent") was fatally shot in the head, chest and hand with a Marlin .22 Magnum rifle that had been stolen from decedent's residence on February 22, 2000.

In 1992, decedent married Kelly Barger ("Kelly"). (Tr. I 255) Together they had two children, Samantha and Chelsea. (Tr. I 254-55; Tr. III 23) In November of 1997 Kelly left decedent and moved in with Petitioner who lived in Caty, Oklahoma, near Elmore City. (Tr. I 255-56; Tr. III 96) In December of 1998, Kelly divorced decedent and married the Petitioner in February 1999.  (Tr. I 256; Tr. III 22, 95-96).  Kelly and the Petitioner had one child, Patience. (Tr. I 254-55; Tr. III 22).  Decedent had primary custody of Samantha and Chelsea when Kelly was with the Petitioner. (Tr. 1309; Tr. II 71; Tr. III 30).

During the first week of February 2000, Kelly informed Petitioner she wanted to get back with decedent and move back to

Caney, which was approximately 2 hours away from Elmore City. (Tr. I 256, 275; Tr. III 24-26, 36, 90-91). Kelly and the Petitioner testified the Petitioner's feelings were hurt, but there was no yelling or fighting. (Tr. I 276; Tr. III 28, 95) However, Petitioner did try to talk her out of leaving.(Tr. III 26).

Kelly wrote a letter to decedent informing him that she wanted to get back together with him and live with him in Caney. (Tr. I 276-77 and Tr. III 26-27). Petitioner said he would take the letter to decedent for Kelly instead of her mailing it to decedent. (Tr. I 276; Tr. III 91, 26-27). Petitioner took the letter and some of Kelly's belongings to Caney. (Tr. I 277; Tr. III 27-28). Petitioner located decedent at a neighbor of decedent's grandmother, and gave decedent the letter informing decedent that Kelly wanted to get back together with him. (Tr. I 277; Tr.III 33). Decedent agreed to Kelly's return. (Tr. I 277; Tr. III 29-33, 91, 93). Petitioner testified that during his conversation, he told decedent he did not appreciate that decedent had been sleeping with Kelly, but otherwise the Petitioner and decedent did not get into a heated argument or confrontation. (Tr. III 92-93).

Kelly made arrangements with decedent to come get her in Caty. (Tr. I 278; Tr. III 39) On February 7, 2000, decedent went to Caty to move Kelly and Patience back to Caney to live with him. (Tr. I 278; Tr. II 5; Tr. III 38, 91, 96). The Petitioner was very sad, cried and moped around a lot after Kelly left. (Tr. II 5-6).

On February 13, 2000, Kelly and decedent made a second trip to Caty to get her remaining items and to pick up Patience from the weekend visitation with the Petitioner. (Tr. I 258, 278; (Tr.III 40-41). Kelly and decedent arrived in Caty in a pick up with two other people. (Tr. I 279; Tr. III 40, 42-43). The Petitioner was at his mother's house while they were at his residence. Kelly,

decedent and the two other people drove to the Petitioner's mother's house to get Patience. (Tr. I 280; Tr. III 42). There was a disagreement about the lack of room to place Patience's car seat in the truck. (Tr. I 258, 280; Tr. II 39-40; Tr. III 42-43) It was decided that Petitioner would drive Patience to Caney later that day, which he did. (Tr. I 258, 288; Tr. 264-65). The Petitioner stayed at decedent and Kelly's residence long enough to give Patience to them and make arrangements for his next visitation with Patience. (Tr. III 45).

Petitioner took Patience back to Caney on February 20, 2000, for the weekend visitation. (Tr. I 287, 310; Tr. II 264-65; Tr. III 67). Kelly informed the Petitioner that he could not keep Patience more than the weekend because she had a WIC appointment that week. (Tr. I 287, 310; Tr. II 264-65, Tr. III 67). However, Kelly testified that she was not sure if she had told the Petitioner the specific day of the appointment, but he knew an appointment was scheduled for that week. (Tr. I 310; Tr. II 264-65).

On February 22, 2000, Kelly had a 9:00 a.m. WIC appointment in Atoka (Tr. I, 260, 286, 288, 310; Tr. II 264). When Kelly returned to her and decedent's residence around noon she found the residence had been ransacked and burglarized. (Tr. I 259-61, 286; Tr. III 127). The television, Kelly's jewelry, tools, and three (3) guns had been taken. (Tr. I 261-63, 290-92). The guns taken included a Marlin .22 Magnum rifle, a disassembled .22 rifle and a muzzle loader. (Tr. I 263, 291).

Decedent had borrowed the .22 Magnum rifle from his uncle, Chester Willeby (Tr. 291, 311; Tr. II 113). Chester Willeby had borrowed the .22 Magnum rifle from Mike Ables and Mike Ables agreed to let decedent borrow the gun. (Tr. I 311; Tr. II 112-13, 126, 135). Both Chester Willeby and Mike Ables testified that the .22

4

Magnum had a dark colored scope. (Tr. II 113, 116-17, 120, 132-33). There was also a silver scope that was part of the dismantled . 22 gun. (Tr. II 117, 120-23). Petitioner did not own any guns. (Tr. II 15). After the burglary and before decedent was murdered, the Petitioner confessed to his roommate, Brandon Satterfield, burglarizing decedent's residence. (Tr. II 8; Tr. III 68). The Petitioner showed Brandon a silver scope and dark scope. (Tr. II 9, 15, 23, 25, 32-33).

Kelly saw the Petitioner on either February 24 or February 25, 2000, when he came to pick up Patience for visitation. (Tr. I 263-64; Tr. III 45, 67, 98). Petitioner brought Patience back to Kelly on February 27, 2000. (Tr. I 264, 283; Tr. III 48, 98). On each of these occasions, Petitioner would stay long enough to give Patience and her items to Kelly and discuss arrangements for the next visit. (Tr. I 264-283). However, on Monday, February 28, 2000, Kelly saw the Petitioner again at around 2:00 p.m. or 3:00 p.m. (Tr. I 265, 283; Tr. III 52-53, 98). No one informed Kelly that the Petitioner was trying to reach her on February 28, 2000. (Tr. I 267). During this visit the Petitioner inquired as to the amounts and who Kelly had written checks to because she had failed to fill out the check stubs in the Petitioner's checkbook. (Tr. I 265, 267; Tr. III 51-52, 54-55, 105). The Petitioner then visited with decedent and Kelly for about two (2) to three (3) hours leaving around 4:30 or 5:00 p.m. (Tr. I 265, 268-69, 283; Tr. III 75). Kelly testified that there was nothing to indicate to her that the Petitioner and decedent were not getting along. (Tr. I 286).

Sometime during the night of February 28, 2000, or early morning February 29, 2000, Samantha, decedent's daughter, looked out her window and saw someone wearing black clothes and a ski mask, holding a "long" gun by Richard's truck. (Tr. II 73-74, 80, 83, 89, 92-93). Samantha saw the person loading the gun and he was wearing

gloves that covered everything but the knuckles, similar to driving gloves. (Tr. II 81-82). Samantha described the person as weighing about as much as her father and the person was a little taller than her father. (Tr. II 87). Samantha went back to sleep. (Tr. II 75, 78-79, 84-85). However, Samantha testified she was not sure if she was dreaming when she saw the person. (Tr. II 73, 92-93).

At around 4:00 a.m. or 4:30 a.m. on February 29, 2000, decedent told Kelly he was getting out of bed to investigate a noise outside. (Tr. I 269, 295; Tr. II 183; Tr. III 122) Decedent told Kelly that someone was outside messing around with the vehicles. (Tr. I 269). Decedent turned the bathroom and living room lights off, then shined a portable light through the living room window. (Tr. I 269, 299, 314; Tr. II 183). Decedent retrieved Samantha's BB gun that was leaning against a dresser in their bedroom as it was the only remaining gun left in the house after the burglary the previous week. (Tr. I 270, 296). Decedent then opened the front door and yelled, "Get out of here. My family is here." (Tr. I 270, 297-98, 315). Kelly heard the door slam and then saw decedent run across the yard, holding the B.B. gun by the barrel in the air screaming. (Tr. I 270, 295, 297, 301-02; Tr. II 183). Kelly heard a gunshot and in less than a minute she heard two more gunshots. (Tr. I 270, 295, 297, 301-302). Kelly did not hear decedent call out any names or indicate that he knew who was outside. (Tr. I 298, 301).

Samantha and Chelsea came out of their bedroom and began crying and yelling. (Tr. I 301). Kelly put Samantha and Chelsea in a closet with a blanket over them to hide them. (Tr. I 270, 302; Tr. II 75, 85). Kelly went to the living room door and locked it. (Tr. I 270). Kelly yelled for decedent, but he did not answer. (Tr. I 270-71, 303; Tr. III 123). The girls were crying and yelling for Kelly. (Tr. I 271; Tr. III 123). After approximately ten (10) minutes, Kelly got the two girls out of the closet, got Patience,

and ran approximately two (2) blocks, to their nearest neighbor, Charlie King. (Tr. I 271, 288, 306; Tr. II 73, 75-76, 78; Tr. III 122-25, 129). It was approximately 5:00 a.m. and slightly raining. (Tr. I 271; Tr. II 78; Tr. III 122, 125, 129).

Kelly and her daughters had been at Mr. King's for about an hour when decedent's aunt arrived to take them back home. (Tr. I 272). Kelly learned decedent had been fatally shot from Deputy Junior Head as she arrived back at her residence. (Tr. I 272).

Kelly had resided with decedent approximately three (3) weeks prior to his murder (Tr. I 271, 31). Approximately twelve hours after the Petitioner had left decedent and Kellys' residence, decedent was shot to death. (Tr. I 265, 273). Kelly testified that the Petitioner did not indicate he was angry and/ or wanted to kill decedent. (Tr. I 309). Kelly testified that she not believe the Petitioner to be a violent person. (Tr. I 309).

Kelly and her three daughters moved back to Caty with the Petitioner approximately four months after decedent was murdered. (Tr. I 273; Tr. III 107; 119-21). Kelly stayed with the Petitioner until he was arrested in March 2001. (Tr. I 273-74).

Brandon Satterfield ("Brandon") lived with the Petitioner over 1 to 2 years. (Tr. II 40; Tr. III 37). Brandon, who was sixteen years old at the time decedent was murdered, was staying with the Petitioner because Brandon's Dad traveled a lot and Brandon did not want to live with his Dad's girlfriend. (Tr. II 40-41; Tr. III 37). Brandon was living with the Petitioner and Kelly when she left. (Tr. II 5; Tr. III 37). Brandon witnessed the Petitioner crying and moping around after Kelly had left. (Tr. II 5-6). Petitioner and Brandon had conversations about decedent dying and different ways the Petitioner could kill decedent, such as strangling him, stabbing

him or shooting him. (Tr. II 6-7). Petitioner and Brandon discussed how the Petitioner could disguise himself such as putting boards on his feet so he would not leave prints, wear a ski mask and paint around his eyes and mouth to disguise his races. (Tr II 6-7, 32). During one of these conversations, Petitioner described to Brandon how the Petitioner could lure decedent out of his house by messing with decedent's truck and making a lot of noise, because someone previously had been messing with decedent's truck late at night. (Tr. II 9-10). Brandon did not take the Petitioner seriously and thought he was just letting off steam. (Tr. II 7, 35).

About a week before decedent was murdered, the Petitioner had told Brandon about the Petitioner burglarizing decedent's residence. (Tr. II 8-9; Tr. III 68). Petitioner told Brandon that he had gone into decedent and Kelly's residence and "messed it up". (Tr. II 8-9). The Petitioner told Brandon that he had thrown papers on the floor and messed up the items in their drawers. (Tr. II 9, 24). Petitioner had told Brandon that he had thought about taking the B.B. gun, but because it belonged to the girls he decided not to take it. (Tr. II 9). Petitioner told Brandon that he had taken a disassembled gun, a .22 Magnum, Kelly's jewelry, a television and some scopes. (Tr. II 9). Petitioner then showed Brandon two scopes. (Tr. II 9, 15, 23, 25, 32-33). Petitioner told Brandon he had thrown the television and disassembled gun behind a tank battery on the other side of Wynnewood. (Tr. II 9). Petitioner also told Brandon that a .22 Magnum was hidden by a water heater, behind a false panel, in Brandon's closet. (Tr. II 9, 36). Brandon was unaware there was a false panel with a water heater behind his closet. (Tr. II 9). Brandon did not see or attempt to look to see if a gun was behind the false panel in his closet. (Tr. II 37).

On February 28, 2000, Brandon was living with the Petitioner and came home at 7:30 p.m. or 8:00 p.m. after visiting with his

father. (Tr. II 26-27). Brandon went to his room and went to sleep.
(Tr. II 11). Brandon did not know whether Petitioner had stayed
home or if the Petitioner left that night because Brandon went to
sleep. (Tr. II 14). Petitioner testified that at around 12:45 a.m.
he left his residence because he could not sleep. (Tr. III 12, 55,
76, 110). Petitioner testified he drove close to Pauls Valley, then
back through Wynnewood and he stopped for gas at approximately 1:30
a.m. in Wynnewood. (Tr. III 12-13, 76-78, 111-112). Petitioner
testified that he then drove close to Davis and returned to his
residence around 2:45 a.m. (Tr. III 79). Brandon did not see the
Petitioner until the next morning at around 7:30 or 7:45 a.m. when
the Petitioner took him to school. (Tr. II 11, 15, 21-22).

Later that afternoon, the Petitioner picked Brandon and his
friend, David, up from school about fifteen minutes later than
usual. (Tr. II 11). David rode up to the Petitioner's house with
them. (Tr. II 11). Brandon and David noticed that Petitioner's car
was clean, which was unusual. (Tr. II 11). Brandon testified that
over a 1 ½ to 2 year period that he resided with the Petitioner the
car had never been vacuumed or dusted. (Tr. II 12).

As the Petitioner, Brandon and David were pulling up to the
Petitioner's trailer, Bill Roady and OSBI Agent Unruh pulled in
behind them. (Tr. II 13, 24; Tr. III 63). Brandon and David went
into Brandon's room. (Tr. II 13). Mr. Roady and Agent Unruh
informed the Petitioner that there had been a homicide in Caney and
wanted to know if he knew anything about it. (Tr. III 63). They
asked whether the Petitioner had been to Caney. (Tr. III 63). The
Petitioner told them that he had been to Caney on Sunday, February
27, 2000, and Monday February 28, 2000. (Tr. III 63). The Agent
Unruh eventually went to Brandon's room, escorted him into another
room and informed him that decedent had been killed and asked him
what he was doing the night before. (Tr. II 13).

On February 29, 2000, the Petitioner went to Harlen Smith's ("Mr. Smith") house late in the afternoon after the Petitioner had spoken with Officer Roady and Agent Unruh. (Depo. Harlan Smith, pp. 4-7, 14, 29; Tr. III 62-63, 100-101). Mr. Smith noticed the Petitioner was nervous and fidgeting. (Depo. Harlen Smith, pp. 4, 18, 20). Petitioner was wearing a black work jacket. (Depo. Harlan Smith, pp. 7, 18, 20). Petitioner used Mr. Smith's telephone in an attempt to page Kelly, but was not able to reach her. (Depo. Harlen Smith, pp. 4-6, 16-18, 20; Tr. III 59-61, 101-102, 104, 115). Petitioner was upset that Kelly had not returned his call. (Depo. Harlen Smith, pp. 20). The Petitioner left around 9:30 p.m. (Depo. Harlan Smith, pp. 5, 9, 15-18; Tr. III 62).

The next day, Mr. Smith's niece called him inquiring whether he knew who was murdered in Caney. (Depo. Harlen Smith, pp. 6, 8-9, 25). Later that same day, the Petitioner went to Mr. Smith's house. (Depo. Harlen Smith, pp. 20, 23). Mr. Smith asked the Petitioner if he knew who was murdered in Caney. (Depo. Harlen Smith, p. 10). The Petitioner told Mr. Smith that Kelly's husband had been murdered and that he had been down at decedent and Kelly's residence in Caney the night before. (Depo. Harlen Smith, pp. 6, 10, 12, 16, 21; Tr. III 62). The Petitioner told Mr. Smith that the police would probably be looking for him because there was evidence of him being at the scene earlier that day, such as his car tires, and his foot and finger prints. (Depo. Harlen Smith, pp. 7, 12, 16, 21, 25; Tr. III 62). The Petitioner also told Mr. Smith that Samantha had seen somebody dressed in black outside her window in the early morning hours. (Depo. Harlen Smith, pp. 19; Tr. III 84). It is not indicated in the record how the Petitioner knew this information.

Approximately a month later, the Petitioner told Brandon that he had gone to Wynnewood to get gas the night decedent was murdered. (Tr. II 14). Every time Brandon would start to discuss decedent's

death the Petitioner would shut him up and tell him in a low voice the car or house might be bugged. (Tr. II 15). Brandon did not tell the police everything he knew the first time he was interviewed. Brandon testified the reason he did not tell the authorities what he knew was that he was afraid that what he knew could get him in trouble, such as Brandon knew about the Petitioner burglarizing decedent's house and he did not report it when the Petitioner told him about it. (Tr. II 15-16, 47-48). Brandon decided to come forward with the complete story when his father could be present and when he learned that Samantha and Chelsea were moving back in with the Petitioner. (Tr. II 29, 49).

OSBI agent, Chris Dill, assisted in the investigation of the death of decedent and was assigned to process the crime scene. (Tr. II 138, 140). Agent Dill gathered evidence, such as bullets, spent shell casings, blood, blood stains, spatters and any type of weapons. (Tr. II 140-41). Agent Dill found six spent .22 Magnum shell casings around decedent's body and around the car that decedent was lying underneath. (Tr. II 140, 148-49, 153, 168, 171). The shell casings appeared to be new. (Tr. II 149, 155, 162, 215).

Agent Dill also found groupings of older spent .22 Magnum shell casings directly out the front door and in the immediate front yard of decedent's residence and not near the car where decedent was found. (Tr. II 158-161). Officer Gordon Robertson, Senior Criminalist and Agent Dill both testified these casing appeared older and had been exposed to the elements longer than the shell casings found near decedent's body. (Tr. II 161-62, 215).

The newer shell casings found around decedent's body and the car he was lying underneath and the older shell casings were submitted to Officer Robertson for ballistics testing. Officer Robertson compared the newer . 22 caliber Magnum spent shell casings

found around decedent's body with the older spent casings found in decedent's immediate front yard and determined that the casings had been fired from the same gun. (Tr. II 210-12, 215-16, 218-20, 225-26, 230). Kelly had seen decedent shooting the .22 Magnum rifle in the front yard, close to the residence, approximately two weeks before he was murdered.

Dr. Ronald DeStefano a forensic pathological and medical examiner, examined the body of decedent. (Tr. II 53). Dr. DeStefano observed four (4) gunshot wounds (Tr. II 54). Dr. DeStefano found one gunshot wound to decedent's head, two gunshot wounds in the chest and one gunshot wound to decedent's hand. (Tr. II 54-57, 163). Dr. DeStefano determined that decedent died as a result of gunshot wounds to his head and chest. (Tr. II 65). Dr. DeStefano retrieved the bullets from each gunshot wound. (Tr. II 61, 63-65). These bullets were also submitted to Officer Robertson, who testified that the four bullets were fired from a Marlin .22 caliber Magnum rifle, just as the spent shell casings. (Tr, II 220).

Decedent had borrowed the Marlin .22 magnum rifle from his Uncle, who had borrowed it from Mike Ables. In February of 2002, Mike Ables found a spent shell casing or bullet to the .22 Magnum in a work truck at his home. (Tr. II 127-130). Mr. Robertson tested this casing and determine that it too had been fired from the same gun. (Tr. II 219-220).

## I. Sufficiency of the Evidence

Petitioner argues in ground one of his Petition that his due process rights guaranteed by the Fourteenth Amendment were violated because the evidence presented at trial was insufficient to convict him of Second Degree Burglary and First Degree Murder. Petitioner alleges his conviction was not supported by sufficient evidence.

Specifically, the Petitioner alleges that because there were no eye witnesses to identify the Petitioner as the person who burglarized decedent's house the State failed to prove the Petitioner committed the crime beyond a reasonable doubt. Respondent asserts the Oklahoma Court of Criminal Appeals considered and found no merit in these claims in Petitioner's direct appeal.  Under the revised federal habeas corpus statutes, habeas corpus relief is proper only when the state court adjudication of a claim:

>    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Sufficiency of the evidence can be considered to be a mixed question of law and fact." <u>Case v. Mondagon</u>, 887 F. 2d 1388, 1392 (10th Cir. 1989), <u>cert. denied</u>, 494 U.S. 1035 (1990).  In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original).

The Supreme Court has repeatedly emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." <u>Wright v. West</u>, 505 U.S. 277, 296 (1992) (citing <u>Jackson</u>, 443 U.S. at 319).  "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not

affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Jackson</u>, 443 U.S. at 326. The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." <u>Grubbs v. Hannigan</u>, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing <u>United States v. Edmondson</u>, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." <u>Beachum v. Tansy</u>, 903 F.2d 1321, 1332 (10th Cir. 1990), <u>cert. denied</u>, 498 U.S. 904 (1990)(citing <u>United States v. Troutman</u>, 814 F.2d 1428, 1455 (10th Cir. 1987)).

To determine whether there was sufficient evidence presented at trial to sustain Petitioner's conviction, the court first must look to Oklahoma law for the elements required for the crime. The elements of Burglary in the Second Degree are as follows:

First, breaking;

Second, entering;

Third, a building;

Fourth, of another;

Fifth, in which property in kept;

Sixth, with the intent to steal.

21 O.S. A. § 1435.

At trial the State presented evidence that the Petitioner confessed to his roommate, Brandon, and went into detail about burglarizing decedent's residence and stealing the murder weapon. (Tr. II 8-9, 24; Tr. III 68). Petitioner told Brandon he had taken a .22 Magnum, a disassembled gun, Kelly's jewelry, a television and some gun scopes. (Tr. II 9). Petitioner then showed Brandon two (2)

scopes. (Tr. II 9, 15, 23, 25, 32-33). Petitioner told Brandon that he had thought about taking the B.B. gun, but because it belonged to the girls he decided not to take it. (Tr. II 9). Petitioner told Brandon he had thrown the television and the disassembled gun behind a tank battery on the other side of Wynnewood. (Tr. II 9). Petitioner also told Brandon that a .22 Magnum was hidden in Brandon's room, behind a false panel, next to a water heater in Brandon's closet. (Tr. II 9, 36). Petitioner at trial testified in his own behalf and denied he had these conversations with Brandon.

Where there are conflicts in the testimony, the court must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses, as it is within the exclusive province of the jury, as fact finders, to weigh the evidence and determine the facts. <u>Jackson</u>, 443 U.S. at 326.

After careful review of the record, this court finds the evidence was sufficient under the standard of <u>Jackson v. Virginia</u>, and the determination by the Court of Criminal Appeals was consistent with federal law. Accordingly, this ground for habeas relief fails.

Petitioner also alleges the State had insufficient evidence to convict him of Murder in the First Degree. The Petitioner alleges that the State failed to prove the Petitioner was the person who fatally shot decedent. Specifically, Petitioner claims that because there were no eye witnesses that could identify the Petitioner as the person who shot decedent with the gun that had previously been stolen during the burglary, the State failed to prove the Petitioner murdered decedent.

To determine whether there was sufficient evidence presented at trial to sustain Petitioner's conviction, the court first must look

to Oklahoma law for the elements required for the crime. The elements of Murder in the First Degree are as follows:

First, the death of a human;

Second, the death was unlawful;

Third, the death was caused by the Petitioner;

Fourth, the death was caused with malice aforethought.

21 O.S.A. § 701.7

From the evidence it could be inferred that whoever stole the gun from decedent fatally shot decedent with it. As the court has previously found the State presented sufficient evidence to prove that the Petitioner burglarized decedent's house and stole the gun. Evidence was presented that the gun which the Petitioner had stolen from decedent was used to kill decedent a week later. (Tr. II 210-12, 215-16, 218-20, 225-26, 230). Further, there was evidence that Petitioner made incriminatory statements to his roommate, Brandon and to Harlen Smith. (Tr. II 6-10, 15, 23-25, 32-33, 36-37; Tr. III 62, 68, 84; Depo. Harlen Smith, pp. 6-7, 10, 12, 16, 19, 21, 25). In fact, there was evidence of a confession to Brandon that he had stolen the .22 caliber Magnum gun from decedent, proving he possessed the murder weapon. (Tr. II 9, 36). It was determined that the same gun that was stolen from decedent was the same gun used to kill decedent. (Tr. II 210-12, 215-16, 218-20, 225-26, 230). Brandon's testimony concerning the burglary is corroborated by Kelly's testimony that the only gun remaining in the house after the burglary was the girl's B.B. gun. (Tr. I 263). Brandon testified that the Petitioner told him he decided not to take the B.B. gun because it belonged to the girls. (Tr. II 9).

The bullets retrieved from decedent's body, the bullet or shell casing found in Mike Ables truck, the new shell casings found near

decedent's body and the old shell casings found clustered in decedent's front yard where decedent had previously fired the gun, were all fired from the same gun. (Tr. II 210-12, 21-16, 218-20, 225-26, 230, 256-57). The gun which was used to shoot decedent was stolen approximately one week before his death. As this court has previously found there was sufficient evidence to establish Petitioner was the individual who stole the gun.

Petitioner's wife had previously been married to decedent. (Tr. I 255). After being married to the Petitioner for approximately one (1) year, Kelly left the Petitioner and moved back to Caney with decedent and their two daughters. (Tr. I 278; Tr. II 5; Tr. III 38-39, 91, 96). Petitioner's roommate, Brandon, observed the Petitioner cry and mope around after Kelly left him. (Tr. II 5-6). Petitioner and Brandon discussed different ways the Petitioner could kill decedent, such as strangling him, stabbing him or shooting him. (Tr. Ii 6-7). Petitioner even discussed different ways he could disguise himself by putting boards on his feet so he would not leave shoe prints, wearing a ski mask and paint around the eyes and mouth so that his race could not be determined. (Tr. II 6-7, 32). Petitioner also told Brandon how the Petitioner could lure decedent out of his residence by messing with decedent's truck and making lots of noise. (Tr. II 9-10) Brandon thought the Petitioner was just letting off steam. (Tr. II 9-10).

Petitioner had been at decedent's residence on February 27 and 28, 2000. On February 28, 2000, the Petitioner had stayed at decedent's residence for an unusually long period of time, visiting with decedent and Kelly. (Tr. I 265, 268-69, 283-84, 313; Tr. III 75). Petitioner left around 4:30 or 5:00 p.m. (Tr. I 265, 268-69, 283-84, 313; Tr. III 75).

Although the Petitioner alleges that there was no eye witness

testimony, Samantha testified that she had looked out her window sometime prior to her father being shot and saw someone wearing gloves, black clothes and a ski mask, loading a long gun by her Dad's truck. (Tr. II 73-74, 80-84, 88-89, 92-93). Samantha testified that the person weighed about the same as her father and the person was approximately two or three inches taller than her father. (Tr. II 87). At the time of the autopsy decedent weighed approximately 195 pounds and was nearly 5'10 tall. (Court Ex. 1-Medical Examiner Report). Petitioner weighed approximately 170-180 pounds and was 6'2 tall. (Tr. III 21). Although Samantha did not see the Petitioner shoot her father, she did see somebody who closely fit the description of the Petitioner at the murder scene.

When the Petitioner visited Harlen Smith on February 29, 2000, Harlen noticed the Petitioner acted nervous and fidgety and that the Petitioner was wearing a black work jacket and new jeans. (Depo. Harlen Smith, pp. 4-7, 14, 18, 20, 29; Tr. III 62-63, 1000-01). The following day the Petitioner told Harlen that decedent had been murdered and that the Petitioner had been at their residence the night before his death. (Depo. Harlen Smith, pp. 6, 10, 12, 16, 21, 25; Tr. III 62). Petitioner also told Harlen during the Petitioner's second visit that Samantha had seen somebody dressed in black outside her window in the early morning hours before her father was shot. (Deop. Harlen smith, pp. 19; Tr. III 84).

Finally, the Petitioner testified that he could not sleep he had left his house at about 12:45 a.m. on the morning decedent was murdered. (Tr. III 12, 55, 76, 110). Petitioner testified that he drove around, stopping in Wynnewood for gas and returned to his residence around 2:45 a.m. (Tr. III 12-13, 55, 76-79, 110-12).

Approximately a month after Agent Unruh and Officer Roady conducted their first interview of the Petitioner and Brandon, the

Petitioner told Brandon that he had gone to Wynnewood to get gas the morning decedent was murdered. (Tr. II 14). When Brandon would attempt to discuss decedent's death with the Petitioner, the Petitioner would shut Brandon up, telling him in a low voice the car or house might be bugged. (Tr. II 15).

When there are conflicts in the testimony, the court must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses, as it is within the exclusive province of the jury to weigh the evidence and determine the facts. After careful review of the record, this court finds the evidence was sufficient under the standard of <u>Jackson v. Virginia</u>, and the determination by the Court of Criminal Appeals was consistent with federal law. Thus, this ground for habeas relief fail.

## II. Admission of Testimony by Deposition

In his second proposition of error, the Petitioner argues the deposition testimony of Harlan Smith was improperly admitted as it violated his Sixth Amendment right to confrontation. It is well settled that claims regarding evidentiary rulings are matters of state law which are not generally cognizable in federal habeas corpus proceedings. <u>Gerlaught v. Stewart</u>, 129 F.3d 1027, 1032 (9th Cir. 1997). In <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991) the Supreme Court held that such matters are not proper for federal habeas corpus relief. Rulings on the admissibility of evidence by state courts may not be questioned in federal habeas proceedings unless such decision renders the trial so fundamentally unfair as to constitute a denial of a federal constitutional right. <u>Duvall v. Reynolds</u>, 139 F. 3d 768, 787 (10th Cir. 1998)(internal citations omitted). Thus, the court must now consider if the use of the deposition instead of live testimony constituted the denial of a federal constitutional right.

First, the court must consider whether a deposition is a proper tool to use in place of live testimony. The Oklahoma Court of Criminal Appeals has held:

> The admissibility of a deposition into evidence does not depend on the purpose for which it was taken. Nor is its use limited to the party who initiated it. Where a deposition is taken and filed in the case it becomes the property of the court and either party is entitled to its use in the trial of the case, subject, however to other rules of evidence and statutory requirements. <u>Smart v. Cain</u>, 493 P.2d 821, 823 (Okla. 1972)

Such requirements are set out in Section 12 O.S.A. § 3232 (A)(3), which specifically states when a deposition can be used in the trial of a case. The statute provides:

> A. Use of Depositions. At the trial or upon the hearing of a motion...any part or all of a deposition, so far as admissible under the Oklahoma Evidence Code applied as though the witness were then present and testifying, may be used against any party who was present or who was represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
>
> > 3. The deposition of a witness, whether or not a party may be used for any purpose if the court finds:
> >
> > > (a) that the witness is dead, or (b) that the witness does not reside in the county where the action or proceeding is pending..., or ( c) that the witness is unable to attend or testify because of age, illness, infirmity or imprisonment, or (d) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena, or (e) that he witness is an expert witness...,(f) upon application and notice, that such exceptional circumstances exist as to make

> it desirable, in the interest of justice
> and with due regard to the importance of
> presenting the testimony of witnesses
> orally in open court, to allow the
> depositions to be used. 12 O.S.A. § 3232
> (A)(3)

The conditions under which a deposition can be used at trial are clearly enumerated and can only be used in those specific situations. Smart at 823. It is clear that a deposition may be admitted into evidence when a witness's age, illness or infirmity prevents the witness from attending or testifying at trial. 12 O.S.A. Sec. 3232 (A)(3)( C). Additionally, this in compliance with 12 O.S.A. Sec. 2804 (A)(4) and (B)(1). This section of the Evidence Codes codifies a traditional exception to the hearsay rule. If a witness is not available due to death or physical or mental illness or infirmity, the witness' prior testimony is not excluded by the hearsay rule if the party against whom the testimony is offered had an opportunity to cross-examine the witness. Fredrick v. State, 37 P.3d 908, 928 (2001)(internal citations omitted). This is similar to the second prong of the standard used when a party wishes to submit prior testimony given at a hearing, such as a preliminary hearing, by a witness who has become unavailable at trial. In the circumstances where a party is wishing to submit hearing testimony of an unavailable witness, the State must show:

> (1) the actual unavailability of the witness despite
> good faith and due diligent efforts to secure the
> presence of the witness at trial; and (2) the
> transcript of the witness' testimony bears sufficient
> indicia of reliability to afford the trier of fact a
> satisfactory basis for evaluating the truth of the
> prior testimony.

Davis v. State, 753 P.2d 388, 391 (Okla. Crim. App. 1988).

Petitioner claims that he had different counsel at the time of the deposition and therefore, his attorney at trial was unable to cross-examine Mr. Smith denying the Petitioner his right to confrontation. However, the Oklahoma Court of Criminal Appeals has held that the preliminary hearing testimony would be allowed even though the Petitioner was represented by different counsel at the preliminary hearing. Britt v. State, 721 P.2d 812, 814-16 ( Okla. Crim. App. 1986). In the case at bar, the Petitioner was represented by counsel at the deposition and Petitioner's counsel was provided ample opportunity to cross-examine Mr. Smith in his deposition and Petitioner's counsel throughly utilized that opportunity. (Depo. Harlen Smith, pp. 8-21, 26-28). There is nothing in the record to indicate that Petitioner's counsel at the deposition was incompetent. Id.

Petitioner also argues that the State failed to prove the actual unavailability of Mr. Smith due to his age, illness, or infirmity because Agent David Cathey was incompetent to testify about Mr. Smith's health and that medical testimony had to be produced before Mr. Smith could be declared unavailable as a witness. 12 O.S.A. § 2701 (1) allows law witness' testimony in a form of an opinion it is rationally based on the perception of the witness. Perkins v. State, 695 P.2d 1364, 1366 (Okla. Crim. App. 1985). Therefore Agent Cathey's testimony concerning the unavailability of Mr. Smith was proper as agent Cathey's had personally observed Mr. Smith's condition deteriorate over a 1 ½ year period.

The record clearly reflects Mr. Smith was unavailable to testify at trial. The trial court held a thorough hearing on the issue of whether Mr. Smith was unavailable. (Tr. II 98-107). Agent Cathy testified that he had been acquainted with Mr. Smith for approximately 1 ½ years. (Tr. II 100). Agent Cathey stated that he had been to Mr. Smith's residence several times. (Tr. II 100). Agent

Cathey testified that Mr. Smith is an 81 year old man who does not ambulate well and spends most of his time off his feet. (Tr. II 100). Agent Cathey stated that when Mr. Smith ambulates it is with the aide of a walker. (Tr. II 101). Agent Cathey stated that Mr. Smith's condition had worsened each time that he visited Mr. Smith. (Tr. II 101). Agent Cathey testified that Mr. Smith was not physically able to travel to the first jury trial held in February of 2002. (Tr. II 101). Agent Cathey testified that over the 1 ½ years Mr. Smith's decline physically had been steady and his condition had not improved since the first jury trial. (Tr. II 101). Agent Cathey stated that Mr. Smith informed him that he could not travel the 1 ½ to 2 hour journey to trial as his doctor had instructed him more than once the travel would not be good for him. (Tr. II 102). Clearly, there was ample evidence of Mr. Smith's unavailability to support the trial courts's decision in admitting the deposition testimony into evidence. This evidence of Mr. Smith's unavailability also meets the first prong of the standard used when a party attempts to present at trial prior hearing testimony of an unavailable witness.

Accordingly, this court finds the deposition testimony of Mr. Smith was properly introduced and the trial court did not abuse its discretion in admitting such evidence. Thus, the court finds the use of the deposition instead of live testimony did not constitute the denial of a federal constitutional right. Thus, the court cannot grant habeas relief on this ground.

**ACCORDINGLY,** Petitioner's petition for a writ of habeas corpus is **DENIED,** and this action is, in all respects, **DISMISSED.**

**Dated this 5th Day of January 2007.**

J4h4i0

Frank H. Seay
United States District Judge
Eastern District of Oklahoma